**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAYON BENSON, *Plaintiff,* v. DELAWARE COUNTY, et al., *Defendants.* | CIVIL ACTION NO. 21-2854 |

**PAPPERT, J.**                                                                    November 28, 2022

## MEMORANDUM

Dayon Benson was stabbed by another inmate while he was a pretrial detainee at the George W. Hill Correctional Facility ("GWHCF"). He filed a civil action under 42 U.S.C. § 1983 and Pennsylvania state common law against Delaware County; The GEO Group, Inc., GEO Corrections, and GEO Care (collectively, the "GEO Defendants"); Warden Lee Tatum; Facility Administrator David Byrne; Correctional Officer K. Yeboah; Correctional Officer C. Gillard; and ten unnamed correctional officers. The Court dismissed Benson's First Amended Complaint (ECF 8) because, among other shortcomings, it did not allege, in its § 1983 failure to protect claim, facts showing that Defendants had notice of a sufficiently substantial danger to Benson. (ECF 14, at 5.) It also failed to state a *Monell* claim because it did not allege facts showing an unconstitutional policy or custom existed, nor that there was a pattern of constitutional violations from inadequate training or an obvious need for more training. (*Id.* at 10.) Benson's Second Amended Complaint added facts to show Defendants were on notice of a specific threat to him. (SAC, ECF 17, ¶¶ 22–33, 37–43.) It also describes activity of a

"gang of four" on his cell block to support new allegations of *Monell* liability for failing to address gang violence. (*Id.* ¶¶22–26, 42–43, 46–47.)

All named defendants moved to dismiss Benson's Second Amended Complaint. (ECF 24.) After reviewing Defendants' Motion and Benson's Response, (ECF 25), the Court grants the Motion with respect to Count II—except that portion of the claim alleging Delaware County and the GEO Defendants failed train employees to address gang activity—and Count III. It denies the Motion with respect to all other claims.

I

Dayon Benson, a pretrial detainee, was incarcerated at GWHCF and housed on Block 4A. (SAC ¶¶ 19–21.) At the time, a "gang of four" other inmates from Block 4A, including Lamar Linehan, was "bullying other inmates on the block and using force and intimidation to run the block." (SAC ¶ 22.) In late June of 2019, the gang stabbed another Block 4A inmate with an improvised weapon. (SAC ¶ 24.) Officers Yeboah and Gillard, who were already aware of the gang's bullying, broke up the attack but did not punish any of the gang members. (SAC ¶¶ 25–26.)

Benson refused to submit to the gang's bullying, so it hatched a plan to attack him with an "improvised weapon." (SAC ¶¶ 27–28.) Word of the plan spread among other Block 4A inmates, the correctional officers and, eventually, to Benson. (SAC ¶¶ 28–30.) Concerned for his safety, Benson submitted a written grievance to the correctional officers on July 4, 2019, warning that "other inmates" planned to "cut" and "jump" him and requesting to be moved to a different housing block for his safety. (SAC ¶¶ 30–32.) The correctional officers, Warden Tatum, and Facility Administrator Byrne received the grievance but did not respond to it. (SAC ¶¶ 34–38.) On two occasions

between July 4 and 6, 2019, Benson verbally warned the correctional officers that the attack was "imminent" and the gang had already acquired the knife it planned to use against him. He also identified the inmates who were threatening him by cell number. (SAC ¶¶ 38–39.) The correctional officers passed his warnings "up the ladder" to Tatum and Byrne, but Benson did not receive a response and no protective measures were taken. (SAC ¶¶ 40–41.)

On the evening of July 6, 2019, Linehan stabbed Benson in the face while the other three gang members blocked others from intervening. (SAC ¶ 42.) Benson sustained a stab wound to his cheek and a three-inch cut across his clavicle. (SAC ¶ 44.) Linehan was "placed in the hole" for his role in the attack, but the other gang members were not disciplined. (SAC ¶ 46.) One week later, the four gang members stabbed another inmate on Block 4A. (SAC ¶ 47.)

Benson's Second Amended Complaint (ECF 17) alleges: (1) failure to protect under § 1983 against the correctional officers, Tatum, and Byrne; (2) *Monell* liability against Delaware County, the GEO Defendants, Tatum and Byrne; (3) state-law corporate negligence against the GEO Defendants and (4) state-law negligence and *respondeat superior* against the correctional officers and GEO Defendants.

II

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the plaintiff's complaint. A district court must conduct a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). First, it must accept the plaintiff's well-pleaded factual allegations as true but may disregard

mere legal conclusions.  *Id.*  Second, it must determine whether the well-pleaded facts, taken as true, show that the plaintiff is entitled to relief.  *Id.*  Factual allegations that "do not permit the court to infer more than the mere possibility of misconduct" will not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### III

Count I of Benson's Second Amended Complaint claims Warden Tatum, Facility Administrator Byrne, and Correctional Officers Yeboah and Gillard failed to protect him from assault by another inmate in violation of 42 U.S.C. § 1983.[1]  "Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation omitted) (cleaned up).  To state a claim under § 1983, Benson must show that (1) "he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk . . . , and (3) the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020).

Whether the conditions of incarceration pose a substantial risk of serious harm is an objective question.  The touchpoint is whether the risk is "one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  An inmate's general fear of harm is not enough.  *Pearson v. Vaughn*, 102 F. Supp. 2d 282, 290 (E.D. Pa.

---

[1]  Benson was a pretrial detainee at the time of the alleged attack, so his claims are governed by the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment protections applicable to convicted prisoners' claims. *See Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 n.4 (3d Cir. 2014).  The Fourteenth Amendment's protections for pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

2000). But courts have found risks posed by inmates with a "propensity" to attack others of a particular group or a grudge against a particular "enemy" and risks posed by members of the general prison population to inmates with a particular vulnerability to qualify as "substantial." *See Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005); *Roque v. Ott*, No. 1:16-CV-02506, 2018 WL 317963, at *3 (M.D. Pa. Jan. 8, 2018). On this third try, Benson has alleged enough to show that he faced a substantial risk of injury by claiming that the gang terrorizing his block—which had already stabbed another inmate on the block—identified him as their next target, told other inmates about their plan to attack him and had already acquired a weapon for the attack.

The deliberate indifference prong requires a plaintiff to show that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Benson alleges that the individual defendants knew about the gang that was bullying inmates on Block 4A and knew that the gang had stabbed another inmate the previous week. (SAC ¶¶ 22, 24–25, 42.) They received Benson's grievance, which reported that "other inmates" on the block had threatened to attack him with a knife. (SAC ¶ 30, 34–36.) Benson also verbally warned the correctional officers on two occasions that the gang had "imminent" plans to attack him with a knife and identified the attackers by cell number.[2] (SAC ¶¶ 38–39.) The correctional officers passed Benson's verbal warnings "up the ladder" to Tatum and Byrne. (SAC ¶ 40.) The facts

---

[2] To the extent that Defendants try to argue that Benson needed to tell officers the names of his attackers, this Circuit's caselaw vitiates their position. *See, e.g.*, *Pearson v. Vaughn*, 102 F. Supp. 2d 282, 290 n.18 (E.D. Pa. 2000); *Dennis v. Smith*, 3:20-CV-00017, 2022 WL 4289021, at *11 (W.D. Pa. Aug. 2, 2022).

alleged show Defendants were aware of the substantial risk to Benson based on the information in his grievance and verbal warnings.

Finally, Benson has adequately alleged that Defendants' failure to act on their knowledge caused him harm. In the two days before the attack, Benson told prison officials about the threat three different times, but no steps were taken to prevent the gang from carrying out its plan. Without intervention, the gang was able to corner and stab Benson. This is sufficient to meet the causation requirement. Defendants argue that the correctional officers were not authorized to move Benson to another block, but tried to protect Benson by forwarding his verbal warnings to Tatum and Byrne. It is true that prison officials are not liable for failure to protect "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. But changing Benson's placement was not the only way to protect him in the short term, and merely passing a warning "up the ladder" is not a reasonable response to a credible threat of an imminent armed attack among inmates.

## IV

### A

In Count II, Benson alleges Warden Tatum, Facility Administrator Byrne, Delaware County and the GEO Defendants had policies, customs or practices of permitting improvised weapons and unlawful assault and battery of pretrial detainees by known violent inmates; ignoring—and encouraging correctional officers to ignore—inmate grievances and verbal warnings of impending attacks; and condoning or ignoring gangs who were bullying other inmates. (SAC ¶¶ 60–62.)

A municipality cannot be held vicariously liable under § 1983 for acts of an employee or agent; rather, an official policy or custom of the municipality must have proximately caused the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Benson does not point to any formal, officially promulgated policy relating to his claims, so they must be analyzed as customs. To plead a custom, a plaintiff must show "that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

The facts alleged in the Second Amended Complaint are not sufficient to show any of the alleged customs existed. Benson argues that the custom of ignoring grievances and verbal warnings of impending attacks is "evidenced by" the handling of his grievance and two verbal warnings. But ignoring three complaints from a single detainee, on a single topic, over a two-day period is not enough to show a "well-settled and permanent" course of conduct for *Monell* liability. Similarly, he has not alleged that allowing known violent inmates to have improvised weapons was a widespread practice. Benson identifies three stabbings by the "gang of four" on Block 4A in a two-week period, but alleges that prison officials had advance knowledge that the gang had a knife in only one of the three incidents. These allegations could show a contained problem, not the widespread or longstanding practice required to constitute a custom. *Cf. Est. of Roman v. City of Newark*, 914 F.3d 789, 799 (3d Cir. 2019) (plaintiff who introduced evidence that police department was under federal supervision for its arrest practices sufficiently alleged departmental custom of unconstitutional arrest practices). The same is true for Benson's claim of a custom of condoning or ignoring gangs—his

allegations are limited to a small gang operating during a short window of time on a single cell block. Moreover, the fact that Linehan was "placed in the hole" following the attack on Benson contradicts his allegation that officials "ignored" gang activity on the block. (SAC ¶ 46.) Because Benson has failed to plead facts sufficient to show that any of the alleged customs existed, his *Monell* claims based on unconstitutional policies and customs fail.

B

Benson also claims that Tatum, Byrne, Delaware County, and the GEO Defendants are liable under a failure-to-train theory. Specifically, he alleges that Defendants maintained inadequate staffing to protect inmates from assaults and address the problem of gangs; failed to adequately train correctional officers on the need to promptly respond to grievances and verbal warnings raising a substantial risk of assault and to address the problem of gangs; and failed to establish adequate policies and procedures for responding to grievances and verbal warnings of imminent assaults and for addressing gang problems. (SAC ¶¶ 63–67.)

To establish *Monell* liability on a theory of failure to train or supervise, a plaintiff must show that (1) "the failure amounts to 'deliberate indifference' to the rights of persons with whom [municipal] employees will come into contact" and (2) the alleged deficiency caused the constitutional violation that harmed the plaintiff. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). On the deliberate indifference prong, the plaintiff must allege that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of

employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Est. of Roman*, 914 F.3d at 798 (quotation omitted) (cleaned up). "Ordinarily" the plaintiff will need to show a "pattern of similar constitutional violations by untrained employees" that would put policymakers on notice of the need for training. *Thomas*, 749 F.3d at 223 (quoting *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011)). Alternatively, the plaintiff can plead "single-incident liability" by showing that the need for training was "so obvious" that failure to provide it can be said to amount to deliberate indifference. *Id.* at 223 (quotation omitted).

i

Benson claims that Defendants should be liable for failure to train officers on responding to grievances and verbal warnings of impending attacks by other inmates. He alleges that prison staff's failure to respond to his grievance and two verbal warnings establishes a pattern of ignoring such warnings. But the failure to respond to a single inmate's complaints about a single issue over a two-day period does not constitute three separate incidents. Moreover, a plaintiff is required to allege a pattern of *similar constitutional violations*. Failing to respond to a grievance is not, itself, a constitutional violation. *Nwani v. Molly*, No. 17-3634, 2018 WL 2461987, at *4 (E.D. Pa. May 31, 2018). The Second Amended Complaint alleges, at most, facts to support a *single* constitutional violation for failure to protect.

Furthermore, Benson cannot proceed on a "single-incident liability" theory because he does not allege facts suggesting that the need for training on responding to grievances and warnings of impending attacks was "obvious." "Liability in single-incident cases depends on the likelihood that the situation will recur and the

9

predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Thomas*, 479 F.3d at 223–224 (quotation omitted) (cleaned up). It could be plausible that policymakers knew employees would confront a situation where staff would have to decide whether to take an inmate's warning that he was about to be attacked seriously. But Benson fails to allege any facts suggesting that correctional officers encountered grievances and warnings on this topic frequently enough that a constitutional violation would be the "highly predictable consequence" of a failure to train. *See Buoniconti v. City of Phila.*, 148 F. Supp. 3d 425, 442–43 (E.D. Pa. 2015); *cf. Thomas*, 479 F.3d at 225 (denying defendants' motion for summary judgment on deliberate indifference to need for de-escalation training where plaintiff presented evidence of "frequent" fights between inmates).

ii

Benson also claims that the *Monell* Defendants failed to provide training and procedures to handle "gangs of prisoner[s] who were bullying, intimidating and threatening other pre-trial detainees/inmates." (SAC ¶¶ 64, 67.) He alleges that a gang of four Block 4A inmates, who Defendants knew had been bullying other inmates on the block, stabbed three inmates during a two-week period. On the one hand, the allegations concern only a single gang on a single cell block, which is not a strong showing of a pattern or practice. But Benson has alleged three serious injuries caused by a gang known to prison officials, and that officials' failure to discipline known participants after the stabbings enabled them to perpetrate more acts of violence against other inmates. (SAC ¶ 47.) At this early stage of the litigation, Benson has alleged just enough of a pattern to permit him to proceed to discovery on Count II as it

10

relates to the failure to train and institute procedures for addressing gangs of prisoners bullying, threatening and intimidating other inmates.

C

Benson's *Monell* claim, to the extent it survives as described in Part IV.B.ii, *supra*, may only proceed against Delaware County and the GEO Defendants, not Warden Tatum or Facility Administrator Byrne.. The Second Amended Complaint names Tatum and Byrne in both their individual and official capacities. (SAC ¶ 15.) "Suits against state officers in their official capacity are 'only another way of pleading an action against an entity of which the officer is an agent.'" *Banegas v. Hampton*, No. 08-5348, 2009 WL 1098845, at *5 (E.D. Pa. April 22, 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)). Because Benson's claims against Tatum and Byrne in their official capacity are "redundant" with his *Monell* claims against the County and GEO Defendants, they will be dismissed. *See id.* Benson also does not allege sufficient personal involvement by Tatum and Byrne to support a *Monell* claim against them in their individual capacities. *See id.*

V

Benson also asserts a Pennsylvania state-law claim for corporate negligence against the GEO Defendants. In *Thompson v. Nason Hospital*, 591 A.2d 703 (Pa. 1991), the Supreme Court of Pennsylvania first recognized the doctrine of corporate negligence and held a hospital directly liable for its own negligent acts, rather than vicariously liable for employees' negligence.

It is unclear whether Pennsylvania's corporate negligence doctrine applies to GEO, a private prison operator. *Smith v. Cmty. Educ. Ctrs., Inc.*, No. 18-5299, 2019 WL

11

2089997, at *4 (E.D. Pa. May 10, 2019). *Thompson* only discussed the doctrine as it applied to hospitals' negligence. In *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582, 606 (Pa. 2012), a case involving a nursing home defendant, the Supreme Court of Pennsylvania clarified that the doctrine is not limited to hospitals. The proper focus, it explained, is on whether the relationship between the parties establishes the requisite duty of care from the defendant to the plaintiff. *Id.* It is unclear, though, whether such a duty exists outside the medical setting under Pennsylvania law. *See Smith*, 2019 WL 2089997, at *4; *Williams v. EMC Mortg. Corp., Inc.*, No. 12-1215, 203 WL 1874952, at *7–8 (E.D. Pa. May 3, 2013).

Even if the GEO Defendants are proper defendants in a corporate negligence claim, Benson fails to plead sufficient facts to show corporate negligence. A plaintiff bringing a corporate negligence claim must show that (1) the defendant failed "to uphold the proper standard of care owed" to the plaintiff, (2) the defendant "had actual or constructive knowledge of the defect or procedures which created the harm" and (3) the defendant's negligence was "a substantial factor in bringing about the harm to the injured party." *Thompson*, 591 A.2d at 341. The Second Amended Complaint alleges fourteen negligent acts by the GEO Defendants, but does not contain sufficient facts to show that any of the acts constitutes corporate negligence under the test set forth in *Thompson*. *See Smith*, 2019 WL 2089997, at *5; *cf. Thompson*, 591 A.2d at 339–40 (identifying four specific duties hospitals owe to patients); *Scampone*, 57 A.3d at 606–07 (emphasizing necessity of "individualized inquiry into" each defendant's duty of care to the plaintiff). Benson's conclusory allegations cannot survive a motion to dismiss this claim.

VI

Finally, Benson alleges that the correctional officers were negligent in failing to protect him from Linehan's attack, and that the GEO Defendants are liable for this negligence under a theory of *respondeat superior*. "It is well settled" under Pennsylvania law "that an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment." *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. 1998) (quotation omitted). Thus, to plead his claim against the GEO Defendants, Benson must allege that the correctional officers were negligent, that they caused him harm, and that they were acting within the course and scope of their employment by the GEO Defendants. The elements of a negligence claim in Pennsylvania are "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. 2005) (quotation omitted). Benson alleges that the correctional officers had a duty to take reasonable measures to protect him from attacks by other inmates, but that they failed to do so. *See* (SAC ¶¶ 52–53), *see also* Part III, *supra*. Benson suffered physical harm during the attack and alleges that his injuries were the direct result of the correctional officers' failure to take any action to prevent the gang from stabbing him. (SAC ¶ 50.) Finally, Benson alleges that the correctional officers were GEO's employees and that they were "acting within the course and scope of their employment" "[a]t all relevant times." (SAC ¶¶ 16–17.) At this stage of the litigation, Benson has

alleged sufficient facts to permit his negligence and *respondeat superior* to proceed to discovery.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.